UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 21-71 (PJS)

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | GOVERNMENT'S SENTENCING |
| v. ) | MEMORANDUM |
| ) | |
| (2) KRISANNE MARIE BENJAMIN, ) | |
| ) | |
| Defendant. ) | |

The United States of America, by and through its attorneys, Charles J. Kovats, Jr., Acting United States Attorney for the District of Minnesota, and Nathan H. Nelson, Assistant United States Attorney, hereby respectfully submits its position and memorandum on sentencing.

## BACKGROUND

In the second half of 2020, defendants Krisanne Benjamin ("defendant") and Jeremiah Ironrope ("Ironrope") engaged in string of violent crimes, including multiple carjackings. In these carjackings, defendant acted as the "lookout" or "getaway driver," while Ironrope threatened or attacked their victims using weapons, such as a baton or a sawed-off shotgun. The two defendants would then flee the scene together. As a result of their actions, defendants sent one victim to the emergency department and another to the hospital. Defendants also participated in a string of other violent and criminal conduct together, which continued unchecked until January 2021, when Minneapolis police finally arrested defendants on numerous outstanding warrants.

On March 23, 2021, a grand jury returned an Indictment charging defendant with three counts of Carjacking (Counts 1, 2, and 3). (ECF 1). The defendant pleaded guilty to Count 3 of the Indictment. (ECF 88). As part of her plea agreement, defendant stipulated to having committed all three carjackings alleged in the Indictment. (ECF 88). The parties agreed that the Court should consider the conduct underlying the carjackings in Counts 1 and 3 for the purpose of calculating her sentencing Guidelines pursuant to USSG 1B1.2(c), but should consider the conduct underlying the Count 2 carjacking only for purposes of fashioning an appropriate sentence under 18 U.S.C. § 3553(a).

On November 23, 2020, U.S. Probation issued a presentence investigation report ("PSR") in this matter. (ECF 103). Consistent with the parties' plea agreement, the PSR concluded that defendant was a minor participant in the crimes pursuant to USSG § 3B1.2 and calculated a combined offense level of 28 for the carjackings contained in Counts 1 and 3. (PSR ¶¶ 31-53). After factoring in an adjustment for acceptance of responsibility, the PSR calculated a total offense level of 25 for the carjackings, which—combined with a criminal history category of V—results in an advisory Guidelines range of 100-125 months' imprisonment. (PSR ¶¶ 54-56, 91-93, 133). Neither party has any objection to the ultimate Guidelines range calculated in the PSR.[1]

---

[1] The parties do not support a one-level loss enhancement for Count 3 because it was not contemplated in the parties' plea agreement and guidelines stipulations. However, this enhancement has no effect on the ultimate Guidelines range.

**POSITION ON SENTENCING**

The only issue before the Court is what constitutes a reasonable sentence in light of the factors enumerated in Title 18, United States Code, Section 3553(a). In fashioning a sentence, Section 3553(a) requires the Court to consider the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence to reflect the seriousness of the offense; the need for deterrence; the need to protect the public from further crimes of the defendant; and the need to avoid unwarranted sentencing disparities. 18 U.S.C. § 3553(a). For the reasons stated below, the § 3553(a) factors support a sentence of 120 months.

A.  **The Present Offenses are Extremely Serious**

Defendant's criminal conduct is extremely serious as it involved three violent carjackings in as many months. Defendant's crimes contributed to astounding and unprecedented surge in carjackings in the Twin Cities metro area since 2020.[2] These crimes are especially serious because they do tremendous damage to both the victims and the community as a whole. As others have noted, these attacks are often swift and frightening for the victims, and feel akin to ambushes.[3] The attacks also terrorize the community writ-large and undermine citizens' collective feeling of safety in their homes

---

[2] See, e.g., https://www.startribune.com/carjackings-sweep-through-twin-cities-communities/600131862/; https://www.startribune.com/staggering-surge-in-violent-carjackings-continues-citywide/573257391/; https://www.mprnews.org/episode/2021/12/14/why-has-a-wave-of-carjackings-hit-the-twin-cities; https://www.axios.com/local/twin-cities/2021/11/09/carjacking-spree-south-minneapolis-ken-norms-video.

[3] See https://www.startribune.com/twin-cities-area-sees-surge-in-carjackings-putting-drivers-on-edge/600116335/.

and streets. That is particularly true because the crimes are random and can seemingly occur almost anywhere and to almost anyone. These same factors also make carjackings difficult for police to solve and hold perpetrators accountable, which contributes to the general feeling of helplessness against the violence.

Defendant committed the first carjacking on June 26, 2020, a day in which she and Ironrope had already stolen a trailer from a home in Maple Grove, crashed and abandoned the trailer on the highway, then assaulted a woman in parking garage and robbed her of her purse. (PSR ¶¶ 8-9). At 11:00 p.m., about an hour committing the robbery in the parking garage, defendants approached S.M. outside of his residence and robbed him of his vehicle. (PSR ¶ 10). During the carjacking, defendant acted as the lookout while Ironrope struck S.M. three times in the head with a collapsible baton, sending him to the emergency department for his injuries. (PSR ¶ 10). This attack caused not only physical wounds to S.M., but also psychological ones. As S.M. stated in his victim impact statement: "I used to feel safe wherever I went even if it was dark because I believed America is a safe country for everyone to stay. I no longer feel that way anymore. I view everyone as a[n] attacker who wants to harm me, so I distance myself from people." (PSR ¶ 23).

Less than two weeks later, on August 7, 2020, defendants sent a man to the hospital during another violent carjacking. This time, defendant and Ironrope targeted the victim (R.G.) on his early-morning paper delivery route, with defendant entering R.G.'s vehicle while Ironrope violently ambushed R.G. by striking him from behind and knocking him unconscious. (PSR ¶ 11). Defendants then took R.G.'s vehicle and used his credit cards at two gas stations and a Target store. (PSR ¶ 12).

4

Three weeks later, on August 28, 2020, defendants committed their third violent carjacking, this time escalating the danger inherent in their conduct by introducing a firearm. In particular, defendants drove to a parking lot and targeted A.M., with defendant keeping watch and manning the getaway vehicle, while Ironrope approached A.M., brandished a sawed-off 12-guage shotgun[4] at him, and demanded his car keys. (PSR ¶ 13). Ironrope took the vehicle and fled the scene, with defendant following in the other vehicle. (PSR ¶ 13). Defendant then met up with Ironrope and joined him in the stolen vehicle, which they attempted to disguise by partially spray-painting it black. (PSR ¶¶ 13-14). The next day, defendant and Ironrope were together in the stolen car when police attempted to stop them. Defendants then compounded their crime by leading police on a dangerous high-speed chase in the stolen vehicle (with Ironrope driving), during which they put still more lives at risk by cutting across lanes of traffic, swerving between cars, and driving through red lights. (PSR ¶ 14). During the pursuit, defendant exited the car and fled on foot, while Ironrope continued fleeing in the car—eventually eluding police and abandoning the vehicle. (PSR ¶ 14). In total, there was over $20,000 in property damage to the vehicle. (PSR ¶¶ 23, 43).

Notably, defendant continued to affiliate with Ironrope after these three violent carjackings and had at least some involvement in two additional carjackings in December 2020. On December 20, 2020, for example, Ironrope committed a fourth carjacking when

---

[4] This was a firearm that neither defendant should not have even have been *possessing*—due to their status as a convicted felons and it being a restricted sawed-off weapon—let alone *using* to commit a violent crime. 18 U.S.C. § 922(g)(1); 26 U.S.C. §§ 5841, 5845(a)(1)-(2), 5861(d), and 5871.

he approached a man (J.S.) who was sleeping in his car before work, pointed a handgun at him, and threaten to shoot him. (PSR ¶ 17). During the carjacking, J.S. observed a Ford Mustang parked nearby and, when Ironrope took his vehicle, the Mustang followed. (*Id.*). Later that morning, Ironrope used the victim's credit cards to make purchases at three retailers. (PSR ¶ 18). Video footage from one of the retailers showed defendant in the Mustang in the parking lot as Ironrope made a purchase inside. (*Id.*). Ultimately, J.S.'s vehicle was abandoned and police found it a week later. The vehicle had been set on fire, causing thousands of dollars of property damage. (PSR ¶¶ 18, 23).

Likewise, on Christmas Day 2020, defendant and Ironrope were captured on video surveillance together entering an apartment complex. (PSR ¶ 19). While at that apartment building, Ironrope committed a fifth carjacking by pointed a handgun at the victim (A.D.) and telling him to "give me the key [to the car] or I'll shoot you in the head." (PSR ¶ 19.)

In sum, defendants engaged in a series of carjackings that were both wanton and violent. Their victims were targeted seemingly at random and either threatened with firearms or assaulted with blunt objects. Although defendant was not the person using the weapons or employing the violence, she encouraged and facilitated the violence by doing such things as keeping watch during the crimes (Counts 1 and 3), assisting in securing the vehicle (Count 2), and providing a means of escape if necessary (Count 3)—all of which protected Ironrope while he engaged in the violence. She also shared in the spoils from the crime by using the vehicles after they were stolen and making purchases with the victims' credit cards. Defendant knew (and, indeed, intended) that violence would be committed to accomplish their criminal objective. She continued to conspire and assist

Ironrope after seeing him commit the acts of violence, and she herself would even use violence if necessary, as evidenced by the fact that she assisted Ironrope in striking the victim of their parking garage robbery an hour before the first carjacking. (*See* PSR ¶ 9). Thus, while the government agrees that Ironrope was violent actor and likely the motivating force behind the crimes, defendant's repeated and willing assistance shows she shares in a substantial degree of culpability for the violence.

Defendant's conduct was also senseless, with violence used to take vehicles for no discernible purpose other than to use for a short time and then discard, causing tens of thousands of dollars in damage in the process. There is no evidence that these were subsistence crimes, motivated by poverty or even a need to support drug addiction. Defendants did not attempt to sell the cars or strip them of parts. Rather, they were purely destructive acts that showed a repeated and callous disregard for the lives and property of defendant's fellow citizens.

**B.     The Present Offenses Were Committed During the Court of a Lengthy Pattern of Criminal Activity**

The egregious nature of the present offenses is also exacerbated by the fact that the carjackings were committed as part of a months-long string of alleged criminal conduct by the defendants. Specifically, in the year or so before her arrest in January 2021, defendant engaged in a variety of other criminal conduct and accumulated approximately nine separate criminal cases that currently remain pending in state court. Much of this other criminal activity was also violent in nature (as discussed in more detail below) and the Court can and should consider this conduct as aggravating in fashioning a sentence. *See*

7

*United States v. Boyd*, 956 F.3d 988, 991-92 (8th Cir. 2020) (a court may consider even unproven facts and allegations underlying other arrests and crimes if they are in the PSR and defendant did not object to them).

On June 25, 2020 (one day before the Count 1 carjacking), for example, defendant and her male accomplice entered a retail store and loaded two carts full of merchandise. (PSR ¶ 109). Defendant then attempted to leave without paying for the items. (*Id.*). When a store employee confronted them, defendant's male accomplice brandished a taser and a collapsible baton, forcing the employees to retreat. (*Id.*). Police responded to the scene and attempted to pursue the defendant's vehicle, but the pursuit was terminated due to the vehicle fleeing at 100 mph. (*Id.*). Defendant was charged with Simple Robbery as a result.

Similarly, in October 2020, defendant and Ironrope stole a dark blue Dodge Ram truck, which they then used in a series of other violent crimes. (PSR ¶ 57). On October 30, 2020, for example, defendants again attempted to leave a retail store without paying for certain items. (PSR ¶¶ 57, 110). When an employee confronted defendants, Ironrope sprayed the employee in the face with pepper spray. (PSR ¶ 110). Defendants then fled the scene in the stolen Dodge Ram. (PSR ¶¶ 57, 110). Defendant was charged with Aiding and Abetting Simple Robbery as a result. (PSR ¶ 110).

On November 9, 2020, defendants committed a retail theft at JC Penney's store. (PSR ¶ 57). When confronted by an employee, Ironrope sprayed the employee with pepper spray and brandished a black handgun, saying "I'll [expletive] shoot you." (PSR ¶ 57). Once again, the defendants fled the scene in the stolen Ram truck. (PSR ¶ 57).

On November 14, 2020, the defendants attempted to leave a retail store without paying for merchandise. (PSR ¶ 108). When employees attempted to confront them, defendants sprayed the employees with a fire extinguisher and Ironrope brandished a collapsible baton at them. (PSR ¶ 108). Another employee approached defendants shortly thereafter, leading Ironrope to threaten the employee by telling defendant "Babe, get my gun." (*Id.*). Defendant and Ironrope once again fled the scene in the stolen Ram truck. (PSR ¶¶ 57, 108). Police attempted to stop them but they ran a red light and sped away. (PSR ¶ 108). Defendant was charged with First-Degree Aggravated Robbery as a result.

On December 7, 2020, first responders found defendant and Ironrope sleeping in another stolen truck. (PSR ¶ 16). As the first responders approached the vehicle, Ironrope woke up, put the car in gear, and sped away—striking and injuring one officer in the process. (*Id.*) Police found the car unoccupied a short time later and recovered the sawed-off Remington shotgun used in the August 28, 2020 carjacking (Counts 3 and 4) together with various ammunition. (*Id.*).

In addition to these overtly violent acts, defendant incurred numerous additional felony and misdemeanor charges during this time, including: Fifth degree drug possession (PSR ¶ 101), five cases of Theft or Theft-by-Shoplifting (¶¶ 102-05, 107); Receiving Stolen Property (¶ 106) and Burglary (¶ 107).

In short, defendant's carjackings were not isolated incidents, but were just one part of a larger pattern of violent and criminal behavior that terrorized the community for months. As with the carjackings, defendant's accomplice (Ironrope) was the person possessing weapons, and threatening and using violence. Once again, however, defendant

9

continued to willingly participate in and aid this pattern of criminal activity. A lengthy custodial sentence is necessary to account for the full scope of defendant's conduct during this time.

### C.   Defendant's Criminal History Supports a Lengthy Sentence

Although defendant's criminal history is not as aggravating as the nature and circumstances of her crimes, it nonetheless supports a substantial custodial sentence. Despite being only 27 years old, defendant already has a significant criminal history. After accumulating a number of juvenile adjudications, including for multiple instances of assaultive conduct (*see* PSR ¶¶ 61, 63-64), defendant went on to accumulate numerous criminal convictions as an adult (*see* PSR ¶¶ 68-89). Defendant has only one prior adult conviction for violent conduct, and most of her adult convictions are for theft or theft-like crimes, which the government acknowledges may be attributable at least in part to her economic and life circumstances. Nonetheless, the defendant's criminal history shows how prior judicial interventions (short of imprisonment) have failed to protect the public or deter defendant from committing crimes. To the contrary, despite numerous past interventions, defendant's criminal conduct is actually *escalating* over time in terms of severity, violence, and frequency.

Particularly concerning is the fact that nearly all of defendant's past crimes and convictions have occurred while on pretrial release or probation from another case. As a result, defendant has accumulated a large number of warrants and probation violations. That pattern has held true through the present day, with the instant offenses (and other pending cases discussed above) occurring while defendant was on probation for four

different previous cases. (PSR ¶¶ 84, 87-90). This demonstrates that a lengthy term of incarceration is necessary both to protect the public from defendant and adequately deter her from committing crimes.

### D. Defendant's History and Characteristics

In contrast to the aggravating nature of the offense and her criminal history, the government agrees that defendant's personal history and characteristics are, on the whole, mitigating. As summarized in the PSR, the defendant had a difficult childhood, during which she spent time in foster care and was exposed and substance abuse. Defendant was also homeless for several years before her arrest and lived at times in an encampment. Defendant also reports a history of mental illness, including PTSD, and has a documented history of severe, substance abuse, which has not yet been successfully treated. Specifically, defendant reports daily abuse of serious drugs including methamphetamine and heroin and is reported to have overdosed on heroin and fentanyl six times. While the Court may consider these to be mitigating factors in fashioning a sentence, the government believes the mitigating nature of these factors is somewhat limited by the lack of evidence that defendant's carjackings were motivated by poverty or drug addiction.

In addition, the government notes that defendant's acceptance of responsibility is a mitigating factor. Defendant accepted responsibility for her charged crimes by pleading guilty before a motions hearing in this case. She also does not object to conduct beyond what was alleged in the Indictment, including the other pending criminal and violent conduct summarized in the PSR. This kind of acceptance of personal responsibility

11

provides reason to hope that defendant can refrain from returning to similar criminal conduct upon release from prison.

In any case, any mitigating factors must be balanced against the aggravating factors, including the extremely serious nature of the offense, in which defendant and her co-defendant effectively terrorized the community for several months with numerous acts of violence.  While defendant unquestionably played a lesser role in that violence than her co-defendant, that fact is already accounted for in her Guidelines calculation through the application of a mitigating role adjustment and lack of a charge under 18 U.S.C. § 924(c). Thus, while mitigating factors are present in this case, they are substantially balanced out by the aggravating factors such that a sentence in the top half of the advisory guidelines range is appropriate and necessary.  Only a sentence in the top half of the range accounts for both the mitigating and aggravating aspects of defendant's personal history, while at the same time reflecting the seriousness of the offense, promoting respect for the law, providing just punishment for the offense, affording adequate deterrence, and protecting the public from further crimes of the defendant.

## **CONCLUSION**

For all the foregoing reasons, the United States respectfully recommends that the Court sentence defendant to a term of imprisonment of 120 months.

                                                Respectfully submitted,

Dated: January 4, 2021                CHARLES J. KOVATS, Jr.
                                                Acting United States Attorney

                                                */s/ Nathan H. Nelson*

                                                BY: NATHAN H. NELSON
                                                Assistant U.S. Attorney
                                                Attorney ID No. 0388713